UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

VS.                                             CASE NO: 2:16-cr-65-FtM-UAMRM

IRA SHAWNTAE SHAW
_____

### ORDER[1]

This matter comes before the Court on Defendant, Ira Shawntae Shaw's Motion to Suppress (Doc. #25) filed on August 19, 2016. The Government filed its Response in Opposition (Doc. #31) on September 6, 2016. A hearing was held on the Motion on October 4, 2016, before the undersigned.

At the hearing, the Government was represented by Assistant United States Attorney Jeffrey Michelland. The Government presented evidence and called Fort Myers Police Officer Lesa Breneman and Detective Emily DeStefanis as witnesses.[2] The Defendant was present and represented by Assistant Federal Public Defender Russell Rosenthal. Shaw also admitted evidence to support his Motion.[3]

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

[2] The Government presented a DVD video of Det. DeStefanis' interview with Shaw (Gov't. Ex.1), a transcript of the interview (Gov't. Ex.2), Shaw's signed Waiver of *Miranda* Rights (Gov't. Ex.3), and Officer Lesa Breneman's dispatch CAD notes (Gov't. Ex.6). *See* (Doc. #47).

[3] Shaw entered into evidence the DVD video of Det. DeStefanis' interview with Shaw (Defense Ex. A) and the transcript of the interview (Defense Ex. B). *See* (Doc. #44).

**BACKROUND**

On May 25, 2016, officers from the Fort Myers Police Department (FMPD) investigated a report that Ira Shaw was outside the Thomas Street Apartments (the Apartments) located at 2930 Thomas Street, Fort Myers, Florida threatening people with a hand gun. Ofc. Lisa Breneman of the FMPD received a call to investigate the incident at 12:27pm. Ofc Breneman confronted Shaw at the scene. Shaw informed Ofc. Breneman that he was at the Apartment to smoke weed with his cousin. Ofc. Breneman observed part of a plastic baggie protruding from the front pocket of Shaw's pants. She inquired of Shaw as to the contents of the baggie. Shaw informed her that the baggie contained weed. Ofc Breneman asked Shaw to hand her the baggie. Shaw gave the baggie to Ofc. Breneman. Ofc. Breneman testified that the baggie contained a green leafy substance which she recognized by sight and odor as marijuana.

Shaw was arrested for being in possession of marijuana at approximately 12:40:30pm. Ofc. Breneman placed Shaw in the back of her patrol car while officers conducted a search of the area. An officer of the FMPD along with his canine Thor conducted a search of the area and found a firearm laying on the ground in an adjacent yard. The FMPD log shows the firearm was located at 1:05pm. Shaw remained in the back of the police cruiser until 1:34pm at which time he was transported to Police Headquarters arriving at approximately 1:38pm.

Det. Emily DeStefanis arrived on the scene approximately 12:45pm. She spoke with Ofc. Breneman and then spoke with Shaw's grandfather who resided at the Apartments. Det. Destefanis went through the Grandfathers apartment and found

ammunition but could not attribute it to Shaw.  Det. Destefanis was informed that a firearm was recovered from a yard that was adjacent to the Apartment's grounds.  Det. Destefanis remained at the Apartment for another thirty to forty minutes after Shaw was transported.  Det. DeStefanis took possession of the firearm.  The magazine was removed from the firearm and the firearm and magazine were placed in a paper bag.  Det. DeStefanis then delivered the firearm to the FMPD Crime Scene Unit from approximately 3:00pm to 3:15pm.

      Crime Scene Technician, Marissa Poppell found a fingerprint on the magazine.  The fingerprint recovered from the firearm's magazine was analyzed by Trina Maurice an FMPD Crime Scene/ Latent Print Analyst.  Maurice found that the print on the magazine matched a known print of Shaw taken from a FMPD file.  Maurice also took a fresh set of prints from Shaw's fingerprints while he was waiting in the interrogation room.  Maurice then confirmed that the print on the firearm's magazine also matched the freshly rolled prints from Shaw.

      Shaw was being held in an interview room at FMPD where he had been brought at approximately 4:11pm.  Det. DeStefanis began the interview around 4:30pm.  Det. DeStefanis knew that Shaw was a suspect in two homicides.  During the interview, Det. DeStefanis told Shaw that she wanted to talk to him about the murder of an individual known to Shaw named Pop which occurred approximately five years prior to Shaw's instant arrest.  Det. DeStefanis also told Shaw she wanted to know what he knew about the murder of Victor Johnson which had occurred recently.  She informed Shaw that since he was considered as a witness to the murders she would need to swear him in as a witness.

After swearing Shaw, Det. DeStefanis informed him that since he was under arrest and not free to leave because of the instant possession charge, she was going to read him his *Miranda* rights. Det. DeStefanis read Shaw his *Miranda* rights from an FMPD form. Det. DeStefanis read the form as follows:

> Okay alright now we'll go down through this like I said because you have your charge and you're under arrest I'm gonna read this portion to you and then I'll get your height weight and all that stuff okay? Before we ask you any questions any you must understand your rights. You have the right to remain silent anything that you say can be used in court you have the right to talk to a lawyer for advice during questioning you have the right to this advice and presence of a lawyer even if you cannot afford to hire one, one will be appointed for you if you wish before any questioning If you wish to answer questions now without a lawyer present you still have the right to stop answering at any time okay?
>
> Shaw: Um hum
>
> DeStefanis: This portion is to confirm that you understand what I read from the which is the rights I just read to you I drew it down here it says I have had read to me the statements of my rights shown above I'm willing to answer questions and make a statement I do not want a lawyer at this time I understand and know what I'm doing no promises or threats have been made against me and no pressure of any kind has been used against me meaning have I threatened you in any way?
>
> Shaw: Nah you ain't threaten me you didn't do nothing.
>
> DeStefanis: Have I made you uncomfortable in any way that's what that means okay so sometimes it doesn't write unless it's right against the table. What I need you to do sign here that you understand the rights that I read to you if you have any questions or if you get uncomfortable you can stop answering at any time.

After hearing his *Miranda* rights, Shaw signed the consent form waiving his *Miranda* rights at approximately 4:26pm. Upon signing the consent to waive his rights,

4

Shaw acknowledged that Det. DeStefanis did not threaten, coerce, or make him uncomfortable in anyway and then agreed to speak with Det. DeStefanis.

During questioning, Shaw at first denied that he had possession of the firearm. When asked by Det. DeStefanis if there was any reason why his fingerprints would be on the firearm recovered by the FMPD, Shaw stated that he threw the firearm into the adjacent yard for somebody else. The interview continued as follows:

> DeStefanis: is there any reason why your fingerprints would be on a firearm?
>
> Shaw: No (Unintelligible)
>
> DeStefanis: Huh?
>
> Shaw: I said if it was I was throwing it for somebody
>
> DeStefanis: If it was you were throwing it for somebody?
>
> Shaw: yeah
>
> DeStefanis: Alright why don't you tell me about that because I need to have a real good reason I did ask you a few minutes ago have you held any guns recently I want to get on a point where you and I are being honest with each other because
>
> Shaw: I'm gonna be honest with you
>
> DeStefanis: I want to get to Pop's stuff cause that's important to me and I don't want to feel like you're telling me some bullshit now.
>
> Shaw: nah I ain't gonna tell you no bullshit.
>
> DeStefanis: Alright I'm asking you about the gun and be straight cause I'm not feeling it.
>
> Shaw: I threw the gun I threw the gun cause the boy had a gun you know what I'm saying he gave it to me he took off running.
>
> DeStefanis: Which boy do you know who he is?

Shaw: The nah I don't know his name but he came back though but they ain't mess with him cause they messing with me. He threw the gun to me or he gave the gun to me he didn't throw it to me he gave the gun to me cause I walked around the corner with him and he took off.

DeStefanis: Alight

Shaw: (Unintelligible) coming

DeStefanis: Where did he have the gun on him?

Shaw: hum? He had it up here

DeStefanis: Okay what was he wearing?

Shaw: a white t-shirt he had something on his head

DeStefanis: Let me ask you something real fast

Shaw: hum?

DeStefanis: when you threw it where did you throw it?

Shaw: I threw it in the yard I turned and threw it and it flew over not the first house but the second house over the fence.

DeStefanis: Okay you're getting emotional I know you don't want to go back to prison right?

Shaw: Un uh

DeStefanis: No?  Alright so look at me I want to look right in your face your name is in some stuff you got kids I know you don't want to be away from your kids clearly you're not an evil person because nobody sits up here and sheds tears you got stuff on your shoulders now I'm reasonable Shanise has probably been talking to you about me for years now alright? I'm fair but I don't do no bullshit and I'm not gonna sit here and BS you you're not in a good spot because your fingerprint is on that gun so there's something there and that's not a good thing for you. So this is where were at your name has come up on Vic's case I'm relentless and I know that there's a lot listen just listen look at me listen to me I'm being straight with you even if you had anything at all I'm gonna find it it's gonna happen and I would rather have you tell me what's real and what's true because if I got to go in front of a jury at some point and I say this man bullshitted me and he gave me nothing

6

they're gonna look at you they're gonna be like he didn't learn there's nothing about this dude that can be fixed and they're going to say throw away the key so if your wrapped up in and if there's something goin on you need to tell me cause I'm gonna find it. That man was loved he was hated at the same time

Shaw: um hum

DeStefanis: but your name is mixed in it and I need to know what's what just like on Pop

Shaw: I don't do shit like that that ain't me

DeStefanis: alright I know you know cause I'm gonna find out even if you had this much to do with it or you didn't know what the hell was gonna happen I got to know but you got to help me if you want me to clear you

Shaw: admit everything

DeSetfanis: you have to help me clear you.

DeStefanis: So you just pretty much just tossed it?

Shaw: yeah I tossed it I tossed it.

DeStefanis: Okay

Shaw: I definitely tossed it.

DeStefanis: that's the only time you ever handled that gun?

Shaw: yeah

DeStefanis: The only problem with that your fingerprint wasn't on the outside it was on the inside of the gun that's a problem so I

Shaw: it was on the inside?

DeStefanis: you just think on that I'll be right back.

Shaw: On the inside?

DeStefanis: Yeah it was, think on it dear... be back.

Shaw: Okay

7

Det. DeStefanis left the interrogation room for approximately one hour.  When she returned Shaw admitted that the firearm was his.  The interview continued:

> DeStefanis: Okay sorry for the wait I had to take care of something alright I know you're thinking trying to figure out what to do
>
> Shaw: nah I know what I got to do.
>
> DeStefanis: what do you got to do?
>
> Shaw: Tell you what it is
>
> DeStefanis: Alright
>
> Shaw: that was my gun
>
> DeStefanis: it's your gun alright where did you get it from?
>
> Shaw: I got it from a friend he let me hold it cause he knew what was going on I'm in fear for my life.
>
> DeStefanis: Well
>
> Shaw: I had just picked it up too
>
> DeStefanis: where did you pick it up from?
>
> Shaw: I don't want to say I don't want to go there

During the interview with Det. DeStefanis, Shaw told her that he was fearful of his life because of the rumors on the street that he was involved in the murder of Pop and Victor.  DeStefanis also told Shaw he needed to think hard about what he wanted to say in regards to the murders of Pop and Victor because he did not want someone else raising his kids.  DeStefanis continued:

> DeStefanis: right? Five years done passed on Pops I'm not gonna stop on that either and there's some shadows in your past for that one according to the streets too all these whisperings and all these talks all these get backs all these revenge all this stuff comes back to people and the best thing I can tell you in the most direct way it's gonna come back so if your hands are dirty on any level whether it's knowing

8

whether it's helping in some kind of way because your people were affected

Shaw: um hum

DeStefanis: the people you have loyalty to that's a big thing I know how that controls the way things happen in Fort Myers

Shaw: yeah

DeStefanis: but this stuff will haunt you and when the chips fall into place and the fingers start getting pointed there's only certain people that take that fall so unless you're prepared to have some other dude raising up your kids you need to pick a lane and you need to be real clear and that's not me being nasty

Shaw: I understand

DeStefanis: that's the nasty part of the situation so I'm being completely honest with you it's gonna come back the stuff on Vic is gonna come back stuff on Pops gonna come back it's already started were already in the process it's already happening

Shaw: um hum

DeStefanis: so if you need a come to Jesus moment this is probably it. If there's something that you need to unload.

No further mention is made about the firearm during the remainder of the interview.

## DISCUSSION

Shaw avers that all of the statements he made during his interview with Det. DeStefanis on May 25, 2016, were obtained in violation of his Miranda rights and the Fifth Amendment to the United States Constitution. The Government replies that Shaw knowingly, intelligently, and voluntarily waived his *Miranda* rights when he made his incriminating statements.

The Fifth Amendment of the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const.

9

amend. V. The United States Supreme Court in *Miranda v. Arizona* considered the scope of this Fifth Amendment guarantee against self-incrimination. *Sanchez-Toribio v. Sec'y, Fla. Dep't of Corr.*, 557 F. Supp. 2d 1322, 1331–32 (M.D. Fla. 2008) (citing *Miranda,* 384 U.S. 436, 86 S .Ct. 1602, 16 L.Ed.2d 694 (1966)). In *Miranda,* the Court held that before a suspect, in custody, can be interrogated, the suspect must be informed of his right to remain silent, that what he says can be used against him, and the right to have an attorney during interrogation, or if he cannot afford an attorney, the right to have one appointed. *Id.* at 478–479, 86 S. Ct. 1602. It is clearly established federal law that a state cannot introduce a suspect's testimony provided in the absence of an attorney without first showing that the suspect made a voluntary, knowing, and intelligent waiver of his *Miranda* rights. *Hart v. Attorney General for Fla.,* 323 F.3d 884, 891 (11th Cir.2003).  A two-prong test is required to determine whether a waiver was voluntary, knowing, and intelligent is twofold: First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court conclude that the *Miranda* rights have been waived. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L.Ed.2d 410 (1986)).

Courts look at four factors, none of which are independently dispositive, to determine whether a statement is voluntary: (1) whether the Miranda warning was given; (2) " '[t]he temporal proximity of the arrest and the confession' "; (3) " 'the presence of

intervening factors' "; (4) " 'the purpose and flagrancy of the official misconduct.' " *Lawhorn v. Allen*, 519 F.3d 1272, 1291 (11th Cir.2008). To determine "knowing" and "intelligent" waiver of Miranda rights, the courts focus on the suspects' comprehension of their rights. *Blanco v. Singletary*, 943 F.2d 1477, 1509–1510 (11th Cir.1991) (citing Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). "'If a defendant cannot understand the nature of his rights, he cannot waive them intelligently.' " *Sanchez-Toribio*, 557 F. Supp. 2d at 1331–32 (citing *Miller v. Dugger,* 838 F.2d 1530, 1539 (11th Cir.1988)). Further, although a suspect's signature on a waiver of *Miranda* rights form is strong evidence, it is not conclusive evidence that the rights were waived. *Id.* (citing *Hart,* 323 F.3d at 893 (citing *North Carolina v. Butler,* 441 U.S. 369, 99 S. Ct. 1755, 60 L.Ed.2d 286 (1979)). Rather, the court must look to the "totality of the circumstances." *Sanchez-Toribio, 557 F. Supp. 2d at 1331–32.* A suspects' age, experience, education, background, intelligence, and physical and mental condition are factors to be considered in determining whether the waiver was made knowingly under the totality of circumstances. *Narine v. Sec'y*, No. 809-CV-1005-T-30TGW, 2010 WL 746440, at *5 (M.D. Fla. Mar. 3, 2010) (citing *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L.Ed.2d 197 (1979)).

      Shaw claims that he was coerced into making incriminating statements by the misrepresentations made by Det. DeStefanis during the interview. Shaw states that DeStefanis undermined the reading of his Miranda rights by swearing him in as a witness and not as the subject of an investigation. Contrary to Shaw's position, Det. DeStefanis was very clear when she told Shaw that she was swearing him in as a witness for questions regarding the murders of Pop and Victor Johnson. After she swore Shaw, Det.

Destefanis also clearly informed him that he was under arrest on other charges. Det. Destefanis said "[o]kay alright now we'll go down through this like I said because you have your charge and you're under arrest I'm gonna read this portion to you and then I'll get your height weight and all that stuff okay? Before we ask you any questions any you must understand your rights."

It's clear from the transcript that DeStefanis explained to Shaw the difference between swearing him as a witness in the ongoing murder investigations and reading him his *Miranda* rights for the criminal charge against him. Shaw was clear that he understood his rights as read by DeStefanis and agreed that she had not coerced him nor threatened him in any way when he agreed to speak with her. Given Shaw's past experiences in the judicial system—arrested in 2007 for Home Invasion Robbery, 2015 arrested for marijuana possession—he clearly had the experience to understand the process.

Shaw further claims that Det. DeStefanis' statements that she would testify before a jury that Shaw was not honest and the jury would throw away the key were made to undermine *Miranda*. Shaw argues that Det. DeStefanis was cajoling him into making an incriminating statement by suggesting if he did she would tell the jury he was honest and he would get leniency. Conversely, if Shaw lied to her, the jury would give him a more severe sentence. Shaw further argues that Det. DeStefanis would be prohibited from telling a jury that he was not credible and as a police officer she would not have any say in his sentencing.

Shaw relies on *Hart v. Attorney General for Fla.* for his proposition that Det. DeStefanis' statements were so egregious that they violated *Miranda*. 323 F.3d at 893. In *Hart*, Defendant Hart and his co-defendants were indicted by a Dade County, Florida

Grand Jury for first degree murder, armed robbery, burglary with assault and battery therein while armed, unlawful possession of a firearm while engaged in criminal conduct, and kidnapping. After his arrest Hart was interviewed by a Metro-Dade County police officer.

During the course of the interview, Hart asked the officer what would be the benefits of having a lawyer present during the interview. The officer told Hart that one disadvantage would be that "the lawyer would tell Hart not to answer incriminating questions," the officer continued that "honesty wouldn't hurt him." Hart subsequently confessed to the crimes and told Schuster the entire story. Hart was convicted and sentenced to life in prison. On appeal, the Eleventh Circuit held that the officer's comment contradicted the *Miranda* warnings given to Hart earlier in the interview.

*Hart* is easily distinguished from the instant case. In *Hart*, defendant was seeking advice on whether or not to evoke his right to counsel and was told by the interviewing officer that answering her questions honestly would not hurt him. The officer's statement contradicted *Miranda's* warning that anything you say can be used against you in a court of law. *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010). By contradicting *Miranda's* warning that anything can be used against you, the officer mislead Hart concerning the consequences of relinquishing his right to remain silent. *Id.* As a result, Hart's confession was not voluntary, knowing, and intelligent as required by *Miranda*. *Id.*

Here, unlike *Hart,* Det. DeStefanis did not specifically undermine *Miranda*, but instead represented to Shaw about how she might testify before a jury if he was not honest with her. However, contrary to Shaw's argument, a police officer's misrepresentation of facts is not enough to render a suspect's confession involuntary, nor

13

will such misrepresentation undermine the waiver of a defendant's *Miranda* rights. *Id.* DeStefanis' statement that she would tell the jury he was not honest and the jury would throw away the key, while not correct, did not contradict nor undermine the *Miranda* warnings previously read to Shaw.

Shaw also argues that the corollary to DeStefanis' statement that the jury would throw away the key if he was not honest with her was that he would receive leniency for his confession. Promises of leniency are relevant to determining whether a confession was voluntary and, depending on the totality of the circumstances, may render the statement coerced. *United States v. Herron*, No. 2:14-CR-23-FTM-38, 2015 WL 867309, at *20 (M.D. Fla. Feb. 4, 2015) (citing *Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir.1997)). "[A] promise of leniency may render a confession involuntary if it was sufficiently compelling and linked to the confession so that it could be said that the defendant's will was overcome by the offer." *Herron*, 2015 WL 867309, at *20*. Nevertheless, the Court may not speculate as to what Shaw may have read into DeStefanis' statements, because the mere perception of leniency on Shaw's part is insufficient for the Court to render Shaw's confession involuntary. *United States v. Shears*, 762 F.2d 397, 401-03 (4th Cir. 1985) (confession voluntary despite defendant's perception that leniency offered) *United States v. Davidson*, 768 F.2d 1266, 1271-72 (11th Cir. 1985) (confession voluntary despite agent's statement that although he could not promise anything, U.S. Attorney could recommend shorter sentence if defendant cooperated).

Det. DeStefanis' did not offer any suggestion of leniency, nor express any *quid pro quo* bargain for a confession. DeStefanis stated that the jury would throw away the key

if she went before them and told the jury Shaw was not honest with her. Her generalized statement that the jury would throw away the key was clearly not a promise nor offer of leniency that would render Shaw's confession involuntary.

## CONCLUSION

It is clear from the testimony and evidence presented during the suppression hearing, that Shaw voluntarily, knowingly, and intelligently waived his *Miranda* rights without any coercion, threats or offers of leniency. Consequently, based on the totality of the circumstances Shaw's wavier of his *Miranda* rights was voluntary, knowing, and intelligent.

Accordingly, it is now

**ORDERED:**

Defendant, Ira Shawntae Shaw's Motion to Suppress (Doc. #25) is **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, on this 23rd day of October, 2016.

*[Signature]*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: Counsel of Record